IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 3, 2008

**ELLIS S. BAUCOM, JR. v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Bedford County**
**No. 10532     Robert Crigler, Judge**

_____

**No. M2007-01034-CCA-R3-PC - Filed November 19, 2008**

_____

The petitioner, Ellis S. Baucom, Jr., pled guilty to aggravated burglary and aggravated robbery, receiving sentences, respectively, of fifteen years and thirty years, to be served concurrently at forty-five percent.  Subsequently, he filed a petition for post-conviction relief, arguing that trial counsel had been ineffective in representing him.  Following an evidentiary hearing, the post-conviction court dismissed the petition.  We affirm that dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Ellis S. Baucom, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Michael D. Randles and Ann L. Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The basis for the petitioner's pleas of guilty was recited by the State at the submission hearing:

> The factual basis is Mr. Claude Thomas, who lives out in a very rural part of the county, was known by a Kenny Porter and his wife.  Apparently they came into information that Mr. Thomas was purported to keep large sums of cash in his home.

So Mr. Porter apparently came up with the idea of having the home entered and the money taken. He apparently discussed this idea with [the petitioner] and Mr. Earl Trotter.

[The petitioner] and Mr. Trotter agreed they would go to the home and enter and steal the money. So the plan was hatched.

On the night that the events occurred, which I believe is June 26, 2004, Mr. Porter in one vehicle led Mr. Trotter and [the petitioner] to the driveway of Mr. Thomas' home and pointed down the driveway, and then [the petitioner] and Mr. Trotter then proceeded down the driveway up to the door of the home. They knocked.

Mr. Thomas was there. It was at night time. He was in bed asleep. He was awakened by the knocking. He asked who it was. And I believe they said something like you know us or something like that.

So he unlocked the door, at which time these defendant[]s entered. One of them essentially shoved Mr. Thomas back on a bed. They immediately grabbed up guns which were within sight of them. According to Mr. Thomas, [the petitioner] grabbed a pump shotgun and actually held it on Mr. Thomas while Mr. Trotter went through the home looking for money. That is what they said they were there for money.

Mr. Thomas pointed to his pants, which were hanging on a bed post. Said there is my wallet. You take that. One of them said no, we are here for the big score. They felt like there should be more than just what was in the wallet.

Mr. Thomas would say that he was struck several times with a pistol in the face. It knocked him back on the bed, and it was during this point that he realized there was a pistol under a pillow, so Mr. Thomas apparently reached for his pistol and came out with that.

It was at that time Mr. Trotter – he may have even fired a shot. Mr. Trotter who was armed with one of Mr. Thomas' own guns, fired a shot back that struck Mr. Thomas in the face causing pretty serious injury to his face. The bullet, I believe, is still lodged in the back of his neck.

It was at that time then the defendants departed with a number of guns. Mr. Trotter apparently did find several thousand dollars in cash hidden in an envelope in a drawer and they departed, fled.

Mr. Thomas was able to call 911[]. They responded. He ultimately had to be carried to Vanderbilt to be treated due to the seriousness of his injuries.

This matter was investigated by the sheriff's department and then also assistance was provided by the [Tennessee Bureau of Investigation]. The sheriff's department received a number of tips which ultimately led them to [the petitioner].

He was interviewed at the time when he was in the Rutherford County [J]ail. He admitted to his involvement. It was Kenny Porter's idea. He participated in it. It was the Trotter defendant who shot Mr. Thomas.

The other two defendants also gave statements implicating themselves and implicating [the petitioner].

At the evidentiary hearing, the petitioner explained his claims that trial counsel had been ineffective. He testified that trial counsel did not explain what occurred at a sentencing hearing and that he thought if he went to trial he would be sentenced to forty to sixty years at 100%, rather than the thirty years at 45% which he was to receive following pleas of guilty. He believed that the State determined the range at which the sentence would be served but, subsequently, learned that this was not correct.

The petitioner said that he understood from trial counsel that, for purposes of setting his sentencing range, his prior convictions for offenses occurring on the same day would count as five separate convictions, rather than as a single conviction.[1] He said that he did not understand that the judge would determine whether the convictions would be counted as one or five for sentencing purposes and that he would have the right to present proof in this regard. According to the petitioner's testimony, had he known all of this at the time of the submission hearing, he would not have pled guilty.

Additionally, the petitioner testified that trial counsel was ineffective because he did not advise the petitioner that it was possible he might be sentenced for lesser offenses, with lesser punishment. The petitioner testified that he gave two statements to the police as they initially were investigating the matter with which he was charged. He said that following the two statements, given on August 30, 2004, and September 7, 2004, he was told by police officers that they would "just charge [him] with what [he] had actually done in the crime." However, he was charged with the same offenses as the others. He told trial counsel about this statement made to him by the officers, as well as his asking about an attorney before questioning.

During cross-examination, the petitioner acknowledged that, in October 2004, he was sentenced for theft over $1000 and found to be an habitual motor vehicle offender and was convicted

---

[1]According to the report prepared by the Board of Probation and Parole, the petitioner was convicted in 1992 in the Davidson County Criminal Court of five counts of aggravated assault, all committed on June 13, 1990.

in 2003 and 2004 of felony DUI.  As a result of these convictions, he served three and one-half years in the penitentiary.

As for what proof he would have presented at the sentencing hearing, the petitioner said that he "would have tried to prove it was, you know, single course of conduct instead of separate felony convictions."  He said that there was only "one accident" and "not five separate felony convictions."  Two people were "seriously injured" as the result of the accident, and the petitioner was not "aware" that the other three were.

Trial counsel testified that he had been licensed to practice law for ten years and that "[o]ne hundred percent" of his practice was "criminal work."  He said that, upon being retained to represent the petitioner, he talked with the attorney at the public defender's office who had been representing the petitioner to that point, obtained a copy of the attorney's file, and reviewed the court's file.  He spoke with both the petitioner and his family regarding the case, which had already been set for trial.  Counsel explained what he told the petitioner during one of their meetings:

> I remember going to the jail to see [the petitioner] and we went over how a trial progressed.  I specifically remember doing that with him, but I also will say that I do that with every client right before a trial.  Everything from how voir dire works through the different steps and I do recall talking to him about how the trial is conducted and if he is found guilty[,] there will be a sentencing hearing and that after that would be a motion for new trial.

Trial counsel said that he explained to the petitioner how a sentencing hearing would proceed and that he "would be able to present any proof, if he had any, to refute whatever the State would introduce."  He said that the petitioner "had been in so many criminal court cases that he knew a lot of the terminology that [counsel] was using without [counsel's] explaining the details of the word."  Counsel detailed the information he provided to the petitioner regarding how, for sentencing purposes, the five convictions would be viewed:

> That was actually a major concern before – I believe before I actually met with him I either talked with him on the phone through a three-way conversation with a family member or talked to a family member about his concerns that these five from what he had heard should not be used as five separate ones, but one because they all occurred within the same criminal transaction.  I did not know the details of those, so at first I said, [i]f they are all part of the same criminal transaction, unless there is an exception in the statute they would be treated as one.
>
> Once I looked into them and found out that . . . although they were part of the same criminal transaction, they were within the exception under the rule.  The Court has already noted.  They were crimes of violence which qualified them to be counted individually rather than collectively.

Counsel said that he "recall[ed] bringing [the petitioner] a copy out of the book we all use of the page that explained that there are exceptions to that general rule of within 24 hours, that they are normally considered one, but this was one of the eight or so exceptions within that rule, his convictions, the aggravated assaults." He said the petitioner appeared to understand that the five convictions would be counted separately but "felt like it was unfair."

Trial counsel testified that the pleas of guilty were "completely voluntary on [the petitioner's] part." He said that he "felt like [the petitioner] understood what he was doing and he was doing it voluntarily." He discussed with the petitioner the notice filed by the State that enhanced punishment was being sought. Counsel said that, to determine how many people in the prior accident had been injured, he went to the clerk's office in Nashville and reviewed the file. He determined that all five of the other persons in the accident had been injured:

> [The petitioner] remembers correctly that only two people were hospitalized, and received serious bodily injury. However, the other three were injured under the law. They received bodily injury. I think the definition is bruises, cuts, scrapes can be considered bodily injury, and they all received some form of bodily injury [al]though[,] as [the petitioner] may or may not remember, . . . minor. They were all injured to some extent. Not hospitalized, I don't think any of them went to a doctor. They were injured. They had scrapes, cuts and bruises that would have applied. That would have come out in a sentencing hearing.

Trial counsel said he and the petitioner discussed the petition to plead guilty, and, according to counsel, the petitioner appeared to understand it. As for the petitioner's statements to police officers, counsel said he understood that the petitioner had waived his right to counsel:

> In my opinion, based upon what he told me and what I read, that is exactly what happened. An inquiry was made, but because he wasn't in custody, first of all, was I didn't think it would hold up. Second of all, he seemed to agree with, You are not in custody, what do you need one for? He went on with the conversation, didn't seem coerced in any way.

Accordingly, counsel saw no merit in filing a motion to suppress the statements. On cross-examination, counsel said that, as to whether the prior convictions should be counted as one rather than five, "if there was any proof that could be brought – that we could bring it, but [counsel] didn't see that [they] had any proof to the contrary to bring."

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn.

1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. Art. I, § 9. In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See Wiley, 183 S.W.3d at 325; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

"In cases involving a guilty plea or plea of *nolo contendere*, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991)). Hill explains the showing of prejudice which must be made by a petitioner who entered a guilty plea:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

474 U.S. at 59, 106 S. Ct. at 370.

On appeal, the petitioner argues that this court should not apply the requirement that he prove his claims by "clear and convincing" evidence but, rather, require that he show a "reasonable probability" that the outcome would have been different. However, we must follow the standard set out in Tennessee Code Annotated section 40-30-110(f) (2006), which provides, in part, that "[t]he petitioner shall have the burden of proving the allegations of fact by clear and convincing

evidence." We conclude that this standard does not conflict with the dictate of Strickland that a petitioner show a "reasonable probability" that, but for the errors of counsel, the outcome of the proceeding would have been different. As we have set out, the post-conviction court's determinations as to deficient performance of counsel and prejudice to the petitioner are subject to *de novo* review on appeal.

At the conclusion of the evidentiary hearing, the post-conviction court made the following findings:

> The Court finds that there are two issues, basically whether the [petitioner] knowingly, understandingly and voluntarily pled guilty on July 18th, [20]05 and whether the [petitioner] received ineffective assistance in failure of counsel to file a motion to suppress the [petitioner's] . . . statement, the first statement. I didn't think there was an attack made on the second statement. Or I will just address both of them for the sake of completeness.
>
> . . . .
>
> The [petitioner] was represented by retained counsel, . . ., at the time he entered his plea.
>
> The [petitioner] conceded that he knew that they would be talking about enhanced sentencing. The Court does not accredit the [petitioner's] testimony. I do not believe the [petitioner] when he said he thought the [district attorney] would determine the range. The [petitioner] did concede that he knew about the 24-hour rule and that bodily injury was involved, that each of those five convictions could be used.
>
> In fact, the [petitioner] was familiar enough with the situation about prior felonies that the Public Defender's office was able, when the State said there were six, the Public Defender's office who represented him prior to [retained counsel] was successful in showing that he did not have all six of those, one was dismissed.
>
> I accredit [trial counsel's] testimony that he advised the [petitioner] about the lesser included offenses.
>
> It appears that the [petitioner] talked to the police on August 30th, [20]04 when he was incarcerated in the Rutherford County Jail on other charges. That was apparently Detective Sam Bragg and a TBI agent. The [petitioner] stated that he did receive his Miranda rights from them and that the colloquy went, when they read the Miranda rights the [petitioner] said, Do I need an attorney and law enforcement responded, You haven't been charged, that is up to you.

-8-

The [petitioner] responded, Well, if I haven't been charged, then I don't want an attorney.

The Court finds that that is not a sufficient account – [trial counsel's] testimony that would have been frivolous to pursue a motion to suppress on the basis of those facts, conceded by the [petitioner], the [petitioner] did not receive ineffective assistance because [trial counsel] did not pursue a motion t[o] suppress.

On that issue or also on the other testimony offered by the [petitioner] that initially stating there was a promise made, what it appears on careful cross examination that the officers, the interviewing officers told the [petitioner] that . . . they would advise the District Attorney of his cooperation and that they would charge him with what he committed or some words to that effect, but the Court's finding is specifically that that colloquy on that subject did not render his statement involuntary and it was not ineffective assistance for [trial counsel] not to pursue a motion to suppress with that factual background.

As to the issue of the [petitioner] offered no proof, apparently [he] isn't even arguing that he didn't understand anything other than the treatment of the five aggravated assaults. On that, the [petitioner] has not proved at this post-conviction hearing that had there been a sentencing hearing that those five convictions would not count as five convictions because the [petitioner] did not . . . say that those five people were not – did receive bodily injury. He said two of them were seriously injured. He wasn't aware or could not answer the [S]tate o[n] the other three injuries. On the other hand, the Court accredits [trial counsel's] testimony that that was a big issue between them and he studied the Davidson County Circuit Court files on those aggravated assaults and found that all five of those did receive bodily injury. In fact, the Court finds that [trial counsel] did correctly advise the [petitioner] on that issue.

The Court further finds that [trial counsel] has practiced criminal law 100 percent for the last ten years both in state and federal court, has about four or five murder trials a year; has, in fact, had one this year, a first degree murder trial in Bedford County. When he first became involved he talked with . . . counsel prior to [his] substitution as counsel. Also went to the Public Defender and reviewed their file as well as the court file. He talked to the [petitioner's] family several times, explained the [petitioner] had a right to a jury trial.

The [petitioner] obviously knew that because the case was set for trial at the time he entered the plea.

Also the Court finds that the [petitioner] has entered pleas on a number of cases in the past and every time, that would be the ag[gravated] assault cases, the habitual motor vehicle offender, two separate felony DUIs, and theft over one

-9-

thousand at which time he would have heard the colloquy that appears in the transcript of the plea acceptance hearing in this case, all of which would have substantiated that he understood everything that was said to him and asked by the Court to ensure his plea was freely, knowingly, understandingly and voluntarily given. The Court does find his plea was freely, knowingly, understandingly and voluntarily given from Exhibit 4 and from Exhibit 8, the petition to enter a plea of guilty.

The Court finds that [the petitioner] and [trial counsel] thoroughly discussed the issue of how prior felonies would count.

I find that the [petitioner] is an intelligent and articulate person, far above average intelligence of the public at large, quite frankly, and he understood the issue, he didn't feel it was fair all five could be used against him. He understood the issue.

And when he pled guilty he understood that. And he did enter his guilty pleas and accepted this sentence freely, knowingly, voluntarily and understandingly.

I find [trial counsel] did provide effective assistance of counsel and the petitioner has not met his burden of proof in establishing that [trial counsel] was not effective in representing him, so I respectfully deny the petition.

We conclude that the evidence supports the determinations of the post-conviction court. As the court found, the petitioner was well-experienced in the criminal justice system, with a number of prior convictions. We note that the listing in the investigative report prepared by the Board of Probation and Parole of the petitioner's prior arrests is five pages long, with some of the arrests being for multiple charges apparently occurring on the same day. Thus, the record supports the determination of the post-conviction court that the petitioner was experienced in criminal procedures. Trial counsel testified that he investigated whether all five of the other persons involved in the accident with the petitioner had been injured and determined that they had been. He explained this to the petitioner, telling him this meant that, for sentencing purposes, the five convictions would be counted separately. The petitioner felt this was "unfair." Counsel said he did not file a motion to suppress the petitioner's two statements to police officers because the petitioner had not been charged at the time and had waived his right to counsel. Thus, such a motion would have been without merit. Although the petitioner's testimony differed in many respects from that of trial counsel, the court accredited counsel's testimony. The post-conviction court determined that the petitioner failed to establish that trial counsel had been ineffective, and the record supports this determination.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition.

_____

ALAN E. GLENN, JUDGE